1
2
3
4
5
6
7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12 | ELENA KOUNITSKI,

Case No. 16-CV-03018-LHK

13 |       Plaintiff,

**ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

14 |    v.

15 | NANCY A. BERRYHILL,

16 |       Defendant.

Re: Dkt. Nos. 25, 31

17

18      Elena Kounitski ("Kounitski") appeals the final decision of the Commissioner of Social

19 Security ("Commissioner") denying Kounitski's application for disability insurance benefits under

20 Title II of the Social Security Act. Before the Court are Kounitski's motion for summary

21 judgment, ECF No. 25 ("Kounitski Mot."), and the Commissioner's cross-motion for summary

22 judgment, ECF No. 31 ("Comm'r Mot."). Having considered the parties' briefs, the relevant law,

23 and the record in this case, the Court hereby GRANTS IN PART Kounitski's motion for summary

24 judgment and DENIES the Commissioner's cross-motion for summary judgment.

25
26
27

1

28

## I.    BACKGROUND

### A.    Kounitski's Age, Educational and Vocational Background, and Claimed Disability

Kounitski was born in 1961.  Administrative Record ("AR") 97.  She has a master's degree in computer science.  AR 63, 533.  From 1997 to 2002, Kounitski worked as a software engineer and earned more than $70,000 for several years.  AR 225, 240.  The record contains different explanations as to why Kounitski left her software engineering job.  Kounitski has stated both that she stopped working to care for her son, AR 453-54, and that she was laid off, AR 52-53, 556.  From 2005 to December 2011, she worked part-time as an in-home support provider.  AR 46, 240.  In her application for disability benefits, Kounitski alleged that she became disabled on December 8, 2011 due to major depressive disorder, anxiety disorder, and poor memory.  AR 238-39.  Specifically, Kounitski testified that she was asked to resign from her part-time job as an in-home support provider because she was late, missed appointments, forgot to give her client the client's required medications, and was crying at work.  AR 46-47; *see also* AR 249.  In an update to her disability benefits application, Kounitski added that she has fibromyalgia.  AR 316-17, 322.  For the first time in her motion for summary judgment, Kounitski also alleged that she has an obsessive-compulsive disorder.  *See* Kounitski Mot. at 4.  Additional facts are discussed as necessary in the analysis.

### B.    Procedural History

Kounitski filed an application for disability insurance benefits in May 2012.  AR 220.  Kounitski alleged that she became disabled on December 8, 2011.  AR 220.  In October 2012, the Commissioner denied her application initially.  AR 111, 147.  On reconsideration in June 2013, the Commissioner appears to have found that Kounitski was disabled.  AR 137, 144, 155.  According to an undated letter from the Commissioner, Kounitski met the medical requirements for disability but the Commissioner had not yet decided whether Kounitski met its unspecified non-medical rules for disability.  AR 155-56.  It is unclear from the record whether this letter was ever sent to Kounitski.  In addition, the letter stated that the Commissioner would send another letter notifying Kounitski of the final disability decision, AR 155-56, but the administrative record

2

contains no further letter. However, the Commissioner determined that the evidence only supported an onset date of July 1, 2012, rather than December 8, 2011. AR 144, 155. Seeking an earlier onset date, Kounitski requested a hearing before an administrative law judge ("ALJ"). AR 159-60.

An ALJ held a hearing on April 3, 2014. AR 38. Kounitski was represented by a non-attorney representative, who filed a pre-hearing letter brief on her behalf. AR 38, 158, 344. Kounitski testified at the hearing. AR 42-62. No medical expert was called. An impartial vocational expert ("VE") testified. AR 62-65. Midway through the VE's testimony, however, Kounitski fell from her chair and an ambulance was summoned. AR 20, 65. Although Kounitski refused transport to the hospital, the remainder of the hearing was rescheduled. AR 20, 65.

The ALJ held a supplemental hearing by telephone on July 31, 2014, and Kounitski was again represented by the non-attorney representative. AR 69. At the supplemental hearing, Kounitski's representative and the ALJ disputed what had happened at the previous hearing. AR 72-73. Kounitski's representative contended that Kounitski lost consciousness, which caused her to fall to the floor. AR 73-74. The ALJ did not think that Kounitski lost consciousness. Instead, the ALJ believed that "[Kounitski] did not slump, she did not slide out of the chair, rather it almost appeared that she threw herself forward and landed on her hands and knees." AR 73-74. After this exchange, a new VE testified.

On October 23, 2014, the ALJ issued a written decision finding that since December 8, 2011 until the date of the decision, Kounitski had not been disabled within the meaning of the Social Security Act. AR 29. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review on April 6, 2016. AR 1.

On June 3, 2016, Kounitski filed a complaint in this Court seeking judicial review of the Commissioner's decision. ECF No. 1. On November 3, 2016, the Court entered an order to show cause why the complaint should not be dismissed for failure to prosecute because Kounitski had not served the Commissioner with the summons and complaint within the time allowed by Federal

United States District Court
Northern District of California

1   Rule of Civil Procedure 4(m).  ECF No. 7 at 1.  On November 10, 2016, Kounitski filed a

2   certificate of service, ECF No. 8, and a response to the order to show cause, ECF No. 9.  The

3   Court found good cause for the delay.  ECF No. 12.  Kounitski then properly served the

4   Commissioner on November 23, 2016, and the Commissioner answered the complaint on

5   February 21, 2017.  ECF Nos. 14, 16.

6           On April 17, 2017, the Court granted the parties' stipulation to extend the deadline for

7   Kounitski to file her motion for summary judgment until April 20, 2017.  ECF No. 19.  On June 1,

8   2017, the Court entered another order to show cause why the case should not be dismissed for

9   failure to prosecute because Kounitski had not yet filed a motion for summary judgment.  ECF

10  No. 20.  Kounitski responded to the order to show cause and requested a deadline extension to file

11  the motion for summary judgment to June 10, 2017.  ECF No. 21.  On June 12, 2017, the Court

12  extended the deadline to June 14, 2017.  ECF No. 22.  On June 14, 2017, Kounitski filed her

13  motion for summary judgment.  ECF No. 25.  On June 15, 2017, the Court vacated its order to

14  show cause.  ECF No. 29.  On September 11, 2017, the Commissioner filed her cross-motion for

15  summary judgment.  ECF No. 31.  Kounitski did not file a reply.

16  **II.      LEGAL STANDARD**

17  **A.      Standard of Review**

18          This Court has the authority to review the Commissioner's decision to deny benefits.  42

19  U.S.C. § 405(g).  The Commissioner's decision will be disturbed only if it is not supported by

20  substantial evidence or if it is based upon the application of improper legal standards.  *Morgan v.*

21  *Cmm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  In this context, the term

22  "substantial evidence" means "more than a mere scintilla but less than a preponderance, i.e., such

23  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

24  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  Where the evidence is susceptible

25  to more than one rational interpretation, the Court must defer to the decision of the Commissioner.

26  *Morgan*, 169 F.3d at 599.  "However, a reviewing court must consider the entire record as a whole

27

28  Case No. 16-CV-03018-LHK
    ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

4

and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins*, 466 F.3d at 882).

**B.     Standard for Determining Disability**

An individual is considered disabled for the purposes of Title II of the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"ALJs are to apply a five-step sequential review process in determining whether a claimant qualifies as disabled." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). At step one, the ALJ determines whether the claimant is performing "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two. At step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments that meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not disabled. If so, the analysis proceeds to step three. At step three, the ALJ determines whether the claimant's impairment or combination of impairments meets or equals an impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. If not, the analysis proceeds to step four. At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled. If not, the analysis proceeds to step five. At step five, the ALJ determines whether the claimant can perform other jobs in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. If not, the claimant

5

1    is disabled.

2        "The burden of proof is on the claimant at steps one through four, but shifts to the

3    Commissioner at step five." *Bray*, 554 F.3d at 1222. "The Commissioner can meet this burden

4    through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines

5    at 20 C.F.R. pt. 404, subpt. P, app. 2." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).

## III.    DISCUSSION

7        Kounitski asserts that the ALJ committed four errors. First, Kounitski argues that the ALJ

8    erred at step two by not finding that her anxiety disorder, obsessive compulsive disorder, panic

9    disorder, and fibromyalgia were severe impairments. Kounitski Mot. at 5. Second, Kounitski

10   contends that the ALJ erred by improperly discounting her subjective symptom testimony. *Id.*

11   Third, Kounitski alleges that the ALJ erred by failing to address her husband's testimony about

12   her symptoms. *Id.* Fourth, Kounitski asserts that the ALJ erred by misweighing the opinions of

13   treating psychiatrists Drs. Levinson, Morales, and Lembke, as well as the opinion of consultative

14   examiner Dr. Gable. Kounitski argues that these errors were not harmless because they caused the

15   ALJ to formulate an RFC that did not incorporate all of Kounitski's severe impairments and

16   symptoms. Kounitski urges the Court to remand to the Commissioner for an award of benefits.

17   *Id.* at 19-20. The Commissioner argues that the ALJ did not err or, in the alternative, that any

18   error was harmless. Comm'r Mot.

19       The Court first summarizes the relevant evidence and the ALJ's opinion, and then the

20   Court assesses whether the ALJ erred.

## A.    Relevant Evidence

22       The Court first discusses the evidence concerning Kounitski's alleged physical

23   impairments, which include a history of vasovagal syncopal episodes and fibromyalgia. A

24   vasovagal syncope episode is fainting caused by the "body overreact[ing] to certain triggers, such

25   as the sight of blood or extreme emotional distress." *Vasovagal syncope*, MAYO CLINIC, available

26   at https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-

27

28   Case No. 16-CV-03018-LHK
     ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

20350527 (accessed Nov. 8, 2017). The vasovagal syncope trigger causes a sudden drop in heart rate and blood pressure, which leads to reduced blood flow to the brain and causes a brief loss of consciousness. *Id.* Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869, at *2 (July 25, 2012).

The Court then discusses the evidence related to her alleged psychological impairments, which include major depressive disorder, anxiety disorder, and obsessive compulsive disorder.

### 1. Physical Impairments

#### a. Vasovagal Syncopal Episodes

On September 29, 2011, Kounitski experienced a syncopal episode in the morning. AR 522. Upon admission to the emergency room, she was found to be bradycardic[1] but asymptomatic and was admitted for further evaluation. AR 522. That evening, Kounitski experienced another syncopal episode, which caused her to fall to the ground and lacerate her scalp. AR 522-23. Monitors showed that Kounitski's heart paused for more than six seconds during the syncopal episode. AR 522-23. Results from an echocardiogram were within normal limits, AR 523, 527, as were CT scans of her spine and brain, AR 529-30. Doctors were unsure of the cause of the syncopal episodes, but they suspected that her psychotropic medications—particularly, Abilify— may have been a cause. AR 523. As a precaution, Kounitski was temporarily taken off of her psychotropic medications. AR 523. Doctors recommended that she have a pacemaker, but Kounitski declined. AR 523. She was discharged from the hospital on October 3, 2011, with diagnoses of syncope, orthostatic hypotension,[2] and bradycardia with significant pause. AR 523.

---

[1] "Bradycardia is a slower than normal heart rate. . . . If you have bradycardia, your heart beats fewer than 60 times a minute." *Bradycardia*, MAYO CLINIC, available at https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474 (accessed Nov. 8, 2017).

[2] "Orthostatic hypotension—also called postural hypotension—is a form of low blood pressure that happens when you stand up from sitting or lying down. Orthostatic hypotension can make you feel dizzy or lightheaded, and maybe even faint." *Orthostatic hypotension (postural hypotension)*, MAYO CLINIC, available at https://www.mayoclinic.org/diseases-conditions/orthostatic-hypotension/symptoms-causes/syc-20352548 (accessed on Nov. 8, 2017).

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

As discussed in the procedural history above, Kounitski fell from her chair during the hearing before the ALJ. She contends that this fall was due to a loss of consciousness brought on by stress. AR 73-74. The ALJ did not think that Kounitski lost consciousness during the fall. AR 20, 73-74. The emergency responders' incident report categorizes the call type as "unconscious/fainting" and notes that the chief complaint was "anxiety and fainting." AR 340. However, the report notes that when the emergency responders arrived, Kounitski was "sitting in a chair alert and oriented" and "did not seem to be in any distress." AR 342. Kounitski testified that she "got anxious and all [she] remember[s is] that [she] found [her]self on the floor." AR 75. Kounitski stated that she remembered that she felt hot and that it was difficult to breathe and she did not know how she wound up on the floor. AR 75. Kounitski also testified that when she mentioned the episode to her doctor, the doctor responded that it was "probably an anxiety attack." AR 76.

### b. Fibromyalgia

In February 2012, Kounitski saw consultative examiner Clark Gable, M.D. Kounitski complained to Dr. Gable of sleepiness, heaviness in the body, fatigue, poor memory, poor focus and concentration, and head and body aches. AR 405. Dr. Gable noted a diminished range of motion in Kounitski's neck and moderate tenderness over the posterior cervical area. AR 406. Dr. Gable opined that Kounitski could sit for up to six hours per day and stand for up to six hours, although he observed that "she's quite fatigued, sleeps poorly, and probably wouldn't have the stamina to do so." AR 406. Dr. Gable does not appear to have considered the possibility of a fibromyalgia diagnosis; indeed, Kounitski was only diagnosed with fibromyalgia by her treating primary care physician later in 2012.

In forms submitted to the Social Security Administration in July 2012, Kounitski described "experiencing pains, numbness, and heaviness in [her] shoulders, arms, upper back, and lower extremities." AR 256; *but see* AR 258 (associating numbness and heaviness in lower extremities with panic attacks). Kounitski stated that she could not walk more than two city blocks before

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

needing to rest, in part due to the heaviness in her legs. AR 256. Kounitski alleged that her illness affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, use her hands, and climb stairs, AR 256, but she did not elaborate on the scope of these alleged limitations. In his third-party function report, Kounitski's husband stated that Kounitski suffered the same limitations in her ability to lift, squat, bend, etc., and he added that "[h]er feeling of constant heaviness in the body and pains in the upper back, neck, and knees and shoulders affect her movements and range of motion." AR 283. Kounitski's husband opined that Kounitski could not lift or carry more than eight pounds or walk more than five minutes at a time, very slowly. AR 283. On another form in December 2012, Kounitski again noted pain in her neck, upper back, shoulders, and knees, which she said made it hard to move around, stoop, lift, and carry things. AR 316-17.

The record also contains several treatment notes from Kounitski's treating primary care provider, Dr. Nakelchik, that relate to fibromyalgia. In May 2012, Dr. Nakelchik noted that Kounitski complained of joint and shoulder aches and exhaustion. AR 374. In July 2012, Dr. Nakelchik noted that Kounitski complained of an "achy back." AR 372. Based on the ICD-9[3] codes in Dr. Nakelchik's notes, Dr. Nakelchik diagnosed Kounitski with myalgia (muscle pain) and myositis (muscle inflammation), unspecified, and prescribed Neurontin. AR 372, 374; *see also* AR 447 (same diagnosis recorded in October 2012). In February 2013, Dr. Nakelchik recorded the same diagnosis and also prescribed Gabapentin. AR 319, 448.

Anna Lembke, M.D., a treating psychiatrist, noted in July 2012 that Kounitski complained of "ongoing muscle pains and fatigue, unknown etiology." AR 411. In a treatment note from August 2012, Dr. Lembke recorded that Kounitski reported being very tired, with pain in her arms, legs, neck, and shoulders. AR 413. By that time, Kounitski was taking medicine for fibromyalgia. AR 413. In September 2012, Kounitski complained of severe pain in her neck and shoulders and described exercise as "torture." AR 416.

---

[3] ICD stands for the International Classification of Diseases; physicians use ICD codes to classify diagnoses, symptoms, and procedures.

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Michael Levinson, M.D., Ph.D., a treating psychiatrist, wrote in a treatment note in May 2013: "Strong SOMATIC preoccupations, reported in the form of multiple somatic complaints, such as persistent headaches and dizziness, persistent abdominal discomfort, lower back, neck, and leg pain, numbness in fingers, frequent shortness of breath, chest pain and arrhythmia. CHRONIC FATIGUE and FIBROMYALGIA-resembling symptoms have been evident." AR 502. Another note from June 2014 contained the same observations and also noted that Kounitski complained of pain in the right arm radiating from the shoulder to fingers. AR 517.

The Disability Determination Explanations completed by agency disability analysts and non-examining physicians at the initial and reconsideration level both noted that Kounitski had the severe impairment of fibromyalgia. *See* AR 104, 123. At the first hearing before the ALJ, Kounitski testified that Dr. Nakelchik diagnosed her with fibromyalgia. AR 51. In response, the ALJ immediately opined that her file did not contain sufficient evidence of fibromyalgia. AR 51. Kounitski also testified that she could not stand for very long because of muscle tiredness and pain. AR 56. Kounitski also testified that she would have knee pain if she crouched or crawled. AR 58. She stated that she had pain in her arms and hands. AR 58.

### 2. Psychological Impairments

#### a. Kounitski's Testimony

Kounitski reported that she first started having symptoms of depression and anxiety around late 2002. AR 258. Kounitski testified that after she stopped working part-time in December 2011, she "spent a lot of time in bed, sometimes the whole day in bed." AR 48; *see also* AR 251. She recounted that movement was difficult for her, as if she were "carrying around a sack of sand." AR 48. Kounitski testified that she did simple dusting, AR 50, but that her husband did the laundry and the dishes, AR 49. Additionally, Kounitski's mother came over once or twice a week to help with housework. AR 50. Kounitski reported that her husband spends a lot of time caring for their younger son because she cannot. AR 252. Kounitski also stated that she often feels weak, tired, sleepy, apathetic, and sometimes dizzy and panicky during the day. AR 251, 253.

Kounitski described losing interest in hobbies she used to enjoy, such as gardening. AR 254-55. She said that she watches television to "distract [her]self from . . . horrible thoughts about [the] uselessness of [her] life and committing suicide." AR 255.

### b. Evidence From Kounitski's Husband

Kounitski's husband submitted a third-party function report in July 2012. AR 278. He stated that he does the cleaning, laundry, and cooking, as well as dropping their son off at school and generally taking care of him. AR 278-80. Kounitski's husband reported that on bad days, Kounitski spends the whole day in bed without brushing her hair or teeth or taking a shower. AR 279. He also stated that Kounitski cannot tolerate crowded places and avoids doing any shopping in big stores. AR 281. He is in charge of the family's finances because Kounitski often misplaced bills and made mistakes in paying them. AR 281.

### c. Treating Psychiatrist Michael Levinson, M.D., Ph.D.

Dr. Michael Levinson, a psychiatrist, treated Kounitski intermittently beginning in May 2010. AR 348, 508-09. In her first appointment in May 2010, Kounitski complained of depression, poor concentration, low energy, fatigue, hypersomnia, a loss of interest in everything, and guilt. AR 349, 508. Dr. Levinson recorded the following observations from the mental status examination ("MSE"): hyperverbal, circumstantial thought processes, depressed mood, constricted affect, and suicidal ideation without plan or intent. AR 349, 508. Dr. Levinson diagnosed Kounitski with major depression, severe and recurrent, and prescribed Pristiq. AR 349, 402, 508. In June 2010, Dr. Levinson noted that Kounitski remained severely depressed and had difficulty tolerating Pristiq. AR 350, 507. He instead prescribed Abilify and Ativan. AR 350, 507. On MSE, Dr. Levinson noted psychomotor retardation, depressed and anxious mood, and nihilistic delusions. He assigned Kounitski a global assessment of functioning ("GAF") score of about 40. AR 350, 507.

> A GAF of 31-40 indicates some impairment in reality testing or communication (speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g.,

11

avoiding friends, neglecting family, unable to work). A GAF of 41-50 indicates serious symptoms (suicidal ideation, severe obsessional rituals[,] frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). A GAF of 61-70 indicates '[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.' Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV) 31-34 (4th ed. 2000).

*Denby v. Colvin*, No. 1:15-cv-00191-SB, 2016 WL 917313, at *9 n.6 (D. Or. Mar. 8, 2016).

"[T]he fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (issued May 27, 2013) abandoned the GAF scale in favor of standardized assessments for symptom severity, diagnostic severity, and disability." *Id.* at *8 n.5.

In July 2012, Dr. Levinson wrote a letter in support of Kounitski's disability insurance claim. AR 402. In the letter, Dr. Levinson recounted that he had diagnosed Kounitski with major depression, severe and recurrent, and remarked that she "presented with marked signs of depression," "exhibit[ed] objective symptoms," and "declar[ed] social/family historic details that fully correspond with the aforementioned diagnosis." AR 402. Dr. Levinson stated that Kounitski's MSE was "remarkable for signs of [major depressive disorder]." AR 402. He also opined that her prognosis was guarded because she had not responded to medication or therapy. As a result, Dr. Levinson wrote that he did not think Kounitski would be able to work within the next twelve months. AR 402. Dr. Levinson resubmitted the same letter in May 2013. AR 510.

In November 2012, Kounitski returned to see Dr. Levinson after her syncopal episodes. AR 506. At the time, Kounitski was taking Zoloft and Abilify. AR 506. On MSE, Dr. Levinson noted psychomotor retardation; depressed and anxious mood; preoccupations with depersonalization, inadequacy, and worthlessness; suicidal and homicidal ideation without plan or intent; nihilistic delusions, impaired immediate and recent memory; and problems with concentration. AR 506. Dr. Levinson noted that Kounitski had tried multiple medications but

12

"seems to have not a good reaction to most of them." AR 506. He recorded a GAF score of about 40. AR 506.

In December 2012, Dr. Levinson recorded the following MSE observations: psychomotor retardation; apathetic, restless behavior; soft speech; depressed and anxious mood; constricted and sad affect; preoccupations with depersonalization, inadequacy, worthlessness, hopelessness, helplessness, and guilt; linear thought process; suicidal and homicidal ideation without plan or intent; nihilistic delusions; hypovigilance; impaired memory, as demonstrated by an MMSE score of 26/30 and an immediate recall of 2/3 items and 1/3 items after five minutes; minimal insight; fair judgment; and limited reliability. AR 505. Kounitski at that time was on Wellbutrin, but was going to try a different class of antidepressants. If the new class of medications did not work, Dr. Levinson contemplated recommending electroconvulsive therapy. AR 505. Dr. Levinson recorded a GAF score of around 40. AR 505.

In January 2013, Dr. Levinson recorded the following MSE observations: psychomotor retardation; preoccupations with depersonalization, inadequacy, worthlessness, hopelessness, and helplessness; suicidal and homicidal ideation with no plan or intent; minimal insight; fair judgment; and limited reliability. AR 504. Dr. Levinson assigned a GAF score of 50. AR 504.

In May 2013, shortly after Kounitski was hospitalized for suicidal ideation (discussed in more detail in Section III.A.2.g, below), Kounitski complained to Dr. Levinson of depressed mood, anhedonia, appetite change, sleep disturbance, fatigue, loss of interest in all activities, feelings of hopelessness, helplessness, worthlessness, and guilt, and poor concentration. AR 502. Dr. Levinson recorded detailed observations in the "objective" section of his treatment note:

> MENTAL STATUS EXAM: Patient is pleasant and cooperative but during this session, has not elaborated spontaneously on any issues. No significant changes in MENTAL STATUS EXAM, remains: alert and oriented x 4. Speech is of low volume, slow, with impediments at times. Mood remains dysphoric and depressed with elements of irritability; affect is flat and downcast, sad and tearful at times; intermittent psycho-motor agitation and retardation is evident by alternating stuporous internal preoccupation and episodes of changing body position, playing with hands and feet. Passive (vague) suicidal ideation is present as well as irritability and loss of interest in all social activities (stopped going to

13

all cultural events or meetings with friends), low energy, poor appetite (and weight loss) for the past year. Reports obsession with ruminative thoughts regarding anxiety, depression, and ongoing vague suicidal ideation without a plan or intent. Patient contracts for safety. Feelings of guilt, hopelessness, helplessness and worthlessness have been expressed and remain prominent. Patient keeps skipping topics concerning the feelings. Thoughts are of normal speed but sometimes slow delay in response or become more circumstantial with evasion of topics re feelings. Communication remains somewhat tangential and circumstantial with episodes of thought blocking corresponding with elements of internal preoccupation. Patient has retained ability to show some abstractive capability re similarities and differences. Denies auditory or visual hallucinations. Paranoid ideation seems to reflect the patient's defense mechanism of projection. Short-term memory deficiency, that was confirmed by other tests: the patient was able to recall only one out of three objects after five minutes. Difficulty completing a health history form due to poor concentration, disturbed by ruminative thoughts and some delay in responses to questions posed to the patient. The patient is able to provide info that is relevant to the patient but defers some of my questions. MMSE 27/30: missed day/calculates and spells poorly/subtract 3 digit numbers/WORLD – DLORW. Due to internal preoccupation and poor concentration as well as short-term memory problems, patient is vague in providing details of recent events. Patient is unable to focus on any issue and believes other noticed change in the personality due to ongoing depressive symptoms.

AR 502. Dr. Levinson opined that Kounitski's depression was "NOT IMPROVED despite the patient has been [sic] compliant with medications and treatment visits." AR 503.

In June 2014, Kounitski complained to Dr. Levinson of the same symptoms as in the previous visit, as well as "very low functionality." AR 517. He recorded many of the same observations on MSE, including but not limited to speech of low volume and slow speed; dysphoric and depressed mood with elements of irritability; flat and downcast affect; sad and tearful at times; tangential and circumstantial communication with episodes of thought blocking; and short-term memory deficiencies. AR 518. Dr. Levinson assessed that Kounitski's depression was partially stabilized with psychotherapy and medication but that she still had severe depressive symptoms. AR 519. He diagnosed major depressive disorder, severe and recurrent, and generalized anxiety disorder. AR 519.

### d. Treating Psychiatrist Anna Lembke, M.D.

Dr. Anna Lembke, a psychiatrist and professor at Stanford, together with several medical

14

residents under Dr. Lembke's supervision,[4] treated Kounitski from January 2011 until April 2013. AR 440, 532. When Kounitski first saw Dr. Lembke, Kounitski reported having suffered from depressive symptoms for about ten years but stated that her symptoms had worsened during the previous four months. AR 532. Kounitski reported a compulsive need to repeat the same sentences over and over again, cyclical obtrusive thoughts, and a remote history of compulsive behaviors in her childhood. AR 532. Kounitski reported suicidal ideation but denied having intent or a plan. AR 533-34. On MSE, Dr. Lembke noted psychomotor retardation, depressed mood and affect, and fair insight and judgment. AR 534. Dr. Lembke diagnosed major depressive disorder, prescribed Celexa, and assigned a GAF score of 41-50. AR 534-35. A week later, Dr. Lembke recorded an identical MSE and GAF score and took Kounitski off of Celexa due to side effects. AR 536. Dr. Lembke also noted that Kounitski experienced anxiety symptoms along with her depressive symptoms and described the anxiety symptoms as "somewhat obsessive/compulsive in quality." AR 536.

Dr. Lembke recorded identical MSEs and GAF scores in February and March 2011. AR 538, 541, 543. On March 9, 2011, Dr. Lembke also diagnosed Kounitski with anxiety not otherwise specified ("NOS"). AR 544, 546. In late March 2011, Dr. Lembke authored a more detailed assessment of Kounitski's condition and concluded that Kounitski had "severe major depressive disorder recurrent, now presenting with significant anhedonia and psychomotor retardation and hypersomnia, with fleeting thoughts of death, but no active suicidality." AR 547. Dr. Lembke noted that she prescribed Kounitski "[Ativan] 0.25 mg daily as needed for breakthrough anxiety." AR 546. Dr. Lembke also referred Kounitski to Dr. Corcoran for psychotherapy. AR 547.

Between March 2011 and Kounitski's syncopal episodes in late September 2011, Kounitski's condition gradually improved. *See* AR 548-96. However, she was taken off of her psychotropic medications while hospitalized for the syncopal episodes, AR 523, and her

---

[4] For simplicity, the Court refers to Dr. Lembke and her residents collectively as "Dr. Lembke."

15

depression subsequently worsened, *see, e.g.*, AR 471, 600.  In November 2011, Dr. Lembke

assessed that "[g]iven [Kounitski's] presentation today, with severely depressed mood, low

energy, low interest, low motivation, and poor concentration, I feel the risks of not treating her

depression outweigh the potential cardiac risks of another antidepressant[]."  AR 600.  Despite

going back on antidepressants, Dr. Lembke noted on MSE in December 2011 that Kounitski had

slight psychomotor retardation, slightly slow and low volume speech, depressed mood and affect,

and fair insight and judgment.  AR 471.  By January 2012, Dr. Lembke recorded the same MSE

observations as in December and noted that Kounitski continued to have "depressive [symptoms],

particularly strong anhedonia and fatigue."  AR 475.  The strong symptoms continued through

April 2012, AR 481, 492, 497, with Kounitski failing to improve despite trying different

antidepressants, AR 497.

In July 2012, Dr. Lembke recorded that Kounitski had just returned from several weeks at

a raw food retreat, where she exercised and lived in a communal environment.  AR 411.

Kounitski reported having a better mood during the retreat, but she still had problems with

attention and memory.  AR 411.  At that time, Kounitski was taking Ativan two to three times per

week for severe anxiety.  AR 411.  Also in July 2012, Dr. Lembke filled out Kounitski's

supplemental certification for state disability benefits.  AR 259.  In the certification, Dr. Lembke

noted that Kounitski's diagnosis was major depression and described Kounitski's symptoms as

"chronic low energy, mood, and concentration."  AR 259.  Dr. Lembke observed that Kounitski

"has had only a partial response to treatment, which has included many medication trials plus

psychotherapy."  AR 259.  Dr. Lembke opined that Kounitski would be able to return to work by

August 1, 2013.  AR 259.

By August 2012, however, Kounitski's depressive symptoms had worsened again.  Dr.

Lembke observed that Kounitski "seem[ed] very dysphoric and withdrawn."  AR 413.  Kounitski

described significant anxiety and fear, which she said "comes out of nowhere."  Kounitski

continued to take Ativan about three times per week for anxiety.  AR 413.  On MSE, Dr. Lembke

United States District Court
Northern District of California

1  recorded psychomotor retardation, slightly slow and low volume speech, a "bad" mood and mood-

2  congruent affect, and fair-to-good insight. AR 414. Dr. Lembke assigned a GAF score of 41-50.

3  AR 414.

4  In September and October 2012, Dr. Lembke again changed Kounitski's medications

5  because Kounitski's symptoms were not improving. AR 417-18, 423. Kounitski's symptoms

6  continued to worsen; by November 2012 she reported having vague suicidal ideation but denied

7  having a plan. AR 427. Dr. Lembke paused the shift in Kounitski's medications because of

8  Kounitski's increased dysphoria. AR 427-28. After starting Nuvigil in December 2012,

9  Kounitski reported improved energy, but continued to report problems with memory and

10  concentration, as well as frequent passive suicidal ideation. AR 429. Dr. Lembke continued to

11  observe psychomotor retardation, slow and low volume speech, and sad mood and affect. AR

12  430, 432.

13  In February 2013, Kounitski's symptoms continued to worsen. Kounitski reported that it is

14  "difficult to move, to do anything." AR 434. Kounitski felt "heavier" and "more hopeless." She

15  spent her days in bed and had trouble concentrating. AR 434-35. On MSE, Dr. Lembke observed

16  that Kounitski made limited eye contact, was only fairly groomed and appeared tired, had

17  psychomotor retardation, slow and low volume speech, a "heavier" mood with a constricted affect,

18  and vague suicidal ideation with no intent or plan. AR 435. On the PHQ-9, a depression

19  screening tool, Kounitski scored 25, which indicates severe symptoms. AR 438.

20  In April 2013, after Kounitski's psychiatric hospitalization, Dr. Lembke noted that

21  Kounitski "continues with debilitating depression," but observed that the significant increases in

22  medication prescribed during Kounitski's hospitalization appeared to have helped. AR 441. On

23  MSE, Dr. Lembke recorded intermittent eye contact, psychomotor retardation, little range of tone

24  and slightly soft volume of speech, and constricted affect. AR 440. Dr. Lembke recorded that

25  Kounitski had hired someone to help her son with homework after school because she could not

26  help him. AR 440.

27

United States District Court
Northern District of California

### e. Treating Psychologist Kathleen Corcoran, Ph.D.

As noted above, Dr. Lembke referred Kounitski to psychotherapy with Dr. Kathleen Corcoran. AR 547. Dr. Corcoran treated Kounitski about every two weeks from approximately April 2011 until October 2012. AR 425, 553. Dr. Corcoran's initial impression was that Kounitski presented with "symptoms of significant depression." AR 556. Dr. Corcoran noted that "[n]egative prognostic indicators include the severity of her current depression and the neurovegetative symptoms she is experiencing." AR 557. On MSE, Dr. Corcoran observed a significantly depressed mood and flat affect. Dr. Corcoran noted that Kounitski "became tearful at many times during the interview." Kounitski also endorsed passive suicidal ideation, but denied plan or intent. AR 556. Dr. Corcoran diagnosed major depressive disorder, recurrent and severe. AR 556.

Overall, Dr. Corcoran's treatment notes are consistent with Dr. Lembke's treatment notes. Dr. Corcoran's notes show that Kounitski's condition improved until her hospitalization for the syncopal episodes in September 2011, after which Kounitski's condition worsened. *See* AR 557-96 (showing improvement); AR 469-500, 597-600 (showing worsening). In March 2012, Dr. Corcoran assessed that Kounitski "has been experiencing symptoms of depression which have not remitted despite medication treatment and psychotherapy. . . . Overall, [Kounitski's] mood has remained depressed though she has experienced periods of improved mood." AR 485. Dr. Corcoran generally assigned Kounitski a GAF score of 50-55. *See, e.g.*, AR 478.

Kounitski stopped seeing Dr. Corcoran in October 2012 for financial reasons and because Kounitski had less time after her husband was diagnosed with cancer. AR 425. During their last session, Dr. Corcoran observed that Kounitski's mood was dysphoric, her affect was flat, and she appeared very tired. AR 426. Kounitski was moderately engaged in the session and endorsed passive suicidal ideation without plan or intent. AR 426.

### f. Treating Psychiatrist R. Alex Morales, M.D.

Dr. R. Alex Morales managed Kounitski's medications beginning in 2013. AR 520; *see*

United States District Court
Northern District of California

*also* AR 338-39 (listing Dr. Morales as a prescriber of Kounitski's medications). In June 2014, Dr. Morales submitted a letter related to Kounitski's disability insurance claim. Dr. Morales wrote that Kounitski's "condition has caused chronic problems with mood regulation, anxiety control, insomnia, [and] cognitive function. Mrs. Kounitski often struggles with somatic problems associated with stress. Mrs. Kounitski struggles with disturbed energy and motivation which often impacts her ability to care for [her] disabled child." AR 520.

### g. 2013 Psychiatric Hospitalization

On March 19, 2013, Kounitski was admitted to the hospital for psychiatric stabilization. Sterling Nakamura, M.D., who treated Kounitski during her hospitalization, noted that Kounitski had "a history of severe refractory depression" and that Kounitski "present[ed] with decompensation in her mood to the point of suicidal thoughts." AR 453. Kounitski reported having severe depression for the previous three years, "but acutely ha[d] been decompensating to the point where she state[d] 'I am suffering so much I cannot see why I have to suffer like this.'" AR 453. Kounitski reported having intrusive suicidal thoughts of overdosing on pills and talking more and more about suicide, the point where a friend insisted she go to the hospital. AR 453, 455. On MSE, Dr. Nakamura observed that Kounitski was "withdrawn in session with no eye contact, staring at the floor, very little spontaneous speech." AR 454. Kounitski's mood was depressed, her affect was flat, her thought process was ruminative, and her thought content was positive for suicidal ideation, hopelessness, helplessness, and worthlessness. AR 454. Kounitski's insight and judgment were poor, and her abstraction was fair. Dr. Nakamura assigned a GAF score of 20 and assessed that Kounitski "require[d] stabilization in the hospital to prevent further decompensation and self-harm." AR 454. Dr. Nakamura drastically increased Kounitski's dosages of phenelzine and lithium. AR 454.

Kounitski "continued to have intrusive severe suicidal thoughts" during the hospitalization, but she did improve somewhat. AR 450. Kounitski was discharged from the hospital on March 27, 2013. AR 450. On the day of discharge, Dr. Nakamura rated Kounitski's eye contact, insight,

judgment, and abstraction as fair.  AR 450.  Kounitski's GAF score by that time was 65.  AR 450.

### h.  Examining Physician Clark Gable, M.D.

Dr. Clark Gable, an internist, performed a consultative examination of Kounitski at the request of the Commissioner in September 2012.  Kounitski told Dr. Gable that she did not feel her current treatment for depression was adequate—she "has no get up and go," as Dr. Gable put it.  AR 405.  Kounitski also reported that she does no housework or cooking and that she seldom drives.  AR 405.  In the portion of his report entitled "physical examination," Dr. Gable wrote that Kounitski "is a very depressed, soft spoken woman," and that "[e]verything is done in slow motion."  AR 405.  Dr. Gable's diagnostic impression was that Kounitski "has an array of significant symptoms compatible with severe depression, chronic, which have been poorly responsive to medication and following a psychiatrist carefully. . . .  She appears to be so depressed that she's not even able to care much for her 11 year old at home, or do any housework."  AR 406.

### i.  Examining Psychologist Aparna Dixit, Psy.D.

Dr. Aparna Dixit, a clinical psychologist, performed a consultative psychiatric evaluation of Kounitski in October 2012.  AR 407.  In preparation for the evaluation, Dr. Dixit examined a subset of Kounitski's records, which notably appears not to have included most of the treatment notes from Drs. Lembke and Corcoran.  AR 407.  Kounitski appears to have relayed to Dr. Dixit a medical history consistent with her medical record.  AR 407-08.  In contrast to Kounitski's and her husband's testimony, Kounitski apparently told Dr. Dixit that Kounitski is able to do household chores such as washing dishes and doing the laundry.  AR 408.  On MSE, Dr. Dixit observed adequate eye contact, no psychomotor agitation or retardation, and no disturbances in speech or thought content.  AR 408-09.  Dr. Dixit observed that Kounitski's mood was depressed and her affect was commensurate with her mood.  AR 409.  Kounitski's memory was intact and her concentration, abstract thinking, insight, and judgment were adequate.  AR 409.  Dr. Dixit assigned a GAF score of 55.  AR 409.

Dr. Dixit assessed that "[f]rom a psychological standpoint, the claimant should have no difficulty performing simple and repetitive tasks. A preliminary mental status assessment indicates her ability to perform complex and detailed tasks is likely mildly to moderately impaired, secondary to depression." AR 409. Dr. Dixit continued, "She will likely have a mild to moderate amount of difficulty working with the public, due to her depression. The claimant will likely have mild difficulty working with supervisors and co-workers as a result of her psychiatric issues. The claimant had no significant difficulty modulating her attention during this evaluation." AR 409-10.

However, Dr. Dixit's report contained the following caveat: "Please note that the findings of the examiner are based on information gathered during this one time-limited mental status evaluation. Should there be discrepancies or conflicts between today's evaluation and any past encounters with this claimant, it is recommended that the claimant's psychiatric diagnosis and symptom severity be verified through examination of medical records from past or present treatment providers." AR 407.

### j. VE Testimony

At the first hearing, VE John Komar testified but his testimony was interrupted by Kounitski's fall from her chair. Before the interruption, Komar testified that someone with Kounitski's age, education, and experience who had the RFC assigned by the ALJ but could perform medium exertion work would be precluded from her previous work as a software engineer. AR 64. However, Komar testified that such an individual could work as a kitchen helper, a hospital cleaner, or a laundry worker. AR 64. When the ALJ adjusted the RFC to be limited to light exertion work, Komar testified that such a person could work as a silverware wrapper, an advertising material distributor, or a housekeeping cleaner. AR 65. At this point in Komar's testimony, Kounitski fell from her chair. AR 65.

At the second hearing, another VE, Kelly Bartlett, testified. AR 79. The ALJ first asked whether Bartlett agreed with Komar's testimony as to the RFC with a medium exertion level.

21

Bartlett agreed with Komar's testimony, although she had different estimates on the number of each job available. AR 81-83. The ALJ then asked Bartlett whether she agreed with Komar's testimony as to the RFC with the light exertion level. AR 83. Bartlett testified that she did not agree that silverware wrapper would be an appropriate job, but Bartlett stated that such a person could work as an assembler of small products, a laundry worker, or a night cleaner. AR 83-85. Bartlett also testified that an employer for such jobs would tolerate the employee being off-task for a maximum of twenty percent of the workday; if the employee were off-task more than twenty percent of the workday, the employee would be fired. AR 85. Bartlett testified that an employer for such jobs would not tolerate more than one absence per month. AR 86.

## B. The ALJ's Decision

The ALJ filed a written decision denying Kounitski's claim on October 23, 2014.[5] AR 20-30. The ALJ applied the five-step evaluation process for determining disability described in 20 C.F.R. § 404.1520. At step one, the ALJ found that Kounitski had not engaged in substantial gainful activity since December 8, 2011. AR 22. At step two, the ALJ found that Kounitski had the following severe impairments: affective disorder and history of vasovagal episodes. AR 22. The ALJ did not specify what type of affective disorder he found to be Kounitski's severe impairment. *See* AR 23. The ALJ specifically rejected Kounitski's assertion that she had fibromyalgia. AR 23. The ALJ stated that "the record does not show that the claimant had widespread pain that had persisted for at least three months and at least eleven positive tender points on physical examination, leading an acceptable medical source to diagnose fibromyalgia, as set forth in SSR 12-2p." AR 23.

---

[5] In the procedural history section of the ALJ's decision, the ALJ wrote that Kounitski's claim was denied initially and on reconsideration. AR 20. Based on the ALJ's comments at Kounitski's hearing, the ALJ appears to believe the claim was denied on reconsideration because none of the non-examining physicians to review Kounitski's file opined that she was disabled. *See* AR 41. However, as this Court noted in the procedural history section above, Kounitski's reconsideration file indicates a finding of disability on reconsideration. *See* AR 137, 144-46. In any event, Kounitski has not challenged on appeal the ALJ's authority to reverse a previous partially favorable disability determination by the agency.

22

At step three, the ALJ found that none of Kounitski's impairments or combination of impairments met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 23-24. Specifically, the ALJ considered Listing 12.04, which includes depressive, bipolar, and related disorders. AR 23. The ALJ did not consider Listing 12.06, which covers anxiety and obsessive-compulsive disorders.

Before moving to step four, the ALJ assigned the following RFC:

> [T]he claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except she can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. She can frequently balance, stoop, crouch, kneel, and crawl. She must avoid even moderate exposure to hazards, such as unprotected heights and dangerous machinery. She can constantly understand, remember, and carry out simple, routine, repetitive tasks and occasionally understand, remember, and carry out complex and detailed tasks. She can tolerate occasional contact with supervisors and coworkers, without tandem tasks, and can tolerate rare public contact (5% of a workday).

AR 24-25.

In coming to this RFC, the ALJ summarized Kounitski's subjective symptom testimony and medical records. AR 25-28. The ALJ wrote that Kounitski "was able to care for her special needs son, perform light household chores, drive a car, walk with her husband, manage her finances, and spend time with others." AR 25. "She listened to music and watched television to distract herself." AR 25. The ALJ also noted that Kounitski sometimes vacationed with her family and that she was trying to increase pleasurable activities in her life, such as gardening and learning Spanish. AR 25-26. The ALJ also summarized records from Dr. Lembke and Dr. Corcoran. The ALJ does not appear to have summarized Dr. Levinson's treatment records, nor Dr. Nakelchik's.

The ALJ concluded that Kounitski's "statements concerning the intensity, persistence and limiting effects" of her symptoms were not entirely credible. AR 27. Specifically, the ALJ found that Kounitski's "allegations of debilitating mental illness are not supported by her reported activities of daily living, psychotherapy treatment notes and medication management notes." AR 27. The ALJ highlighted evidence that Kounitski cared for her younger son, traveled, and

experienced a better mood during her raw food retreat.  AR 27.  In addition, the ALJ opined that Kounitski's complaints of problems with concentration and memory were undermined by MSEs that "document that her thought process was goal directed and coherent and that her cognitive function was intact."  AR 27.

As for medical opinion evidence, the ALJ gave no weight to Dr. Levinson's opinion "to the extent it purports to resolve the ultimate medicolegal issue reserved to the Commissioner. Moreover, [Dr. Levinson] does not attach or cite to any treatment record.  His opinion that the claimant cannot sustain work due to her psychiatric symptoms is unsupported."  AR 27-28.  The ALJ gave little weight to Dr. Gable's opinion because "his opinion appears to be based on the claimant's self-reports of severe, chronic depression."  AR 28.  The ALJ also "note[d] that the claimant reported a wider variety of daily activities to her treating providers during the relevant period."  AR 28.  The ALJ gave great weight to the opinion of Dr. Dixit "as it is well developed, based on objective medical evidence, and consistent with the assessments of her treating providers."  AR 28.  The ALJ gave little weight to the opinion of Dr. Morales, "as it contains conclusory statements and is unsupported by references to objective medical evidence or treatment records generally."  AR 28.  The ALJ also noted that Dr. Morales "is not listed on the medical evidence of record."  AR 28.

At step four, the ALJ found that Kounitski could not perform her past relevant work.  AR 28.  At step five, the ALJ found that, considering Kounitski's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Kounitski could perform.  AR 28.  Relying on the VE testimony, the ALJ found that Kounitski was capable of performing the requirements of representative occupations such as assembler of small products, laundry worker, and night cleaner.  AR 29.  Accordingly, the ALJ determined that Kounitski was not disabled for the purposes of the Social Security Act.  AR 29.

C.  **Analysis**

As noted above, Kounitski asserts that the ALJ committed a range of harmful errors,

including failing to account for all of her severe impairments, improperly discounting her testimony, failing to consider her husband's testimony, and improperly weighing medical opinion evidence. The Court addresses these arguments in turn.

### 1. The ALJ Erred at Step Two by Failing to Consider the Alternate Diagnostic Criteria for Fibromyalgia and Failing to Find the Severe Impairment of Anxiety

At step two, the ALJ determines whether the claimant suffers from any medically determinable severe impairments. 20 C.F.R. § 404.1520(a)(4)(ii). "The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is 'not severe.'" *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). According to the regulations in effect at the time Kounitski's case was decided,[6] "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 C.F.R. § 404.1521. The Ninth Circuit has characterized the step two inquiry as "a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. "An impairment . . . can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Id.*; *see also Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) ("[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'").

Kounitski asserts that the ALJ erred at step two in several ways. First, Kounitski argues that the ALJ erred by failing to find that Kounitski had the severe impairment of fibromyalgia and by using only one of two diagnostic methods for evaluating fibromyalgia. Kounitski Mot. at 6 & n.9. Second, Kounitski argues that the ALJ erred by failing to find the severe impairment of anxiety or panic disorder. *Id.* at 6. Third, Kounitski argues that the ALJ erred by failing to find the severe impairment of obsessive-compulsive disorder. *Id.*

The Commissioner responds that the ALJ did not err with respect to fibromyalgia because

---

[6] 20 C.F.R. § 1421, among other regulations, was revised effective March 2017. Unless otherwise specified, the Court refers to the regulations in effect at the time of the ALJ's decision.

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Kounitski testified that Dr. Nakelchik merely "suggested" that she had fibromyalgia. Comm'r Mot. at 5. As to an anxiety disorder, the Commissioner argues that the ALJ's finding of a severe affective disorder encompassed depression as well as anxiety. *Id.* at 4-5. Finally, as to obsessive-compulsive disorder, the Commissioner argues that Kounitski never asserted that she had obsessive-compulsive disorder and that the record does not support a diagnosis of obsessive-compulsive disorder.

The Court first addresses fibromyalgia, then turns to anxiety and obsessive-compulsive disorder.

### a. Fibromyalgia

The ALJ cited SSR 12-2p for the diagnostic criteria for fibromyalgia. AR 23. SSR 12-2p "provide[s] two sets of criteria for diagnosing [fibromyalgia]": the first set of criteria is based on the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia ("the 1990 criteria"), and the second set of criteria is based on the 2010 American College of Rheumatology Preliminary Diagnostic Criteria ("the 2010 criteria"). SSR 12-2p, 2012 WL 3104869 at *2. The 1990 criteria require a history of widespread pain that has persisted for at least three months; at least 11 positive tender points on physical examination; and evidence that other possible diagnoses have been excluded. *Id.* at *2-3. The 2010 criteria, by contrast, require a history of widespread pain; "[r]epeated manifestations of six or more fibromyalgia symptoms, signs,[7] or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome"; and evidence that other possible diagnoses have been excluded. *Id.* at *3.

---

[7] SSR 12-2p identifies relevant symptoms and signs as follows: "muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms." SSR 12-2p, 2012 WL 3104869 at *3 n.9.

26

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The ALJ only addressed the 1990 criteria. *See* AR 23 ("the record does not show that the claimant had . . . at least eleven positive tender points on physical examination"). He did not address the 2010 criteria, which SSR 12-2p clearly identifies as acceptable alternative diagnostic criteria. Accordingly, the ALJ incorrectly applied the law when he determined that Kounitski did not have the severe impairment of fibromyalgia. Moreover, Kounitski's medical records suggest that she may meet the 2010 criteria for fibromyalgia based on her repeated manifestations of depression, anxiety, fatigue, memory problems, muscle pain, dizziness, nervousness, and abdominal pain. *See, e.g.*, AR 502. Contrary to the Commissioner's assertion, the fact that Kounitski testified that Dr. Nakelchik "suggested" the diagnosis of fibromyalgia has little significance where Kounitski also testified that she was diagnosed with fibromyalgia. AR 51. In any case, the ALJ can assess whether Kounitski meets the 2010 criteria in the first instance on remand.

### b. Anxiety

The Commissioner contends that the term "affective disorder" encompasses depression and anxiety disorder. Comm'r Mot. at 4-5. For this proposition, the Commissioner cites only a website called Healthline, a consumer health information site. *Id.* at 5. The Commissioner does not cite any agency regulations, SSRs, or caselaw to suggest that the Commissioner interprets the term "affective disorder" to encompass anxiety disorders. In fact, the agency's regulations suggest the opposite—that the Commissioner considers affective disorders and anxiety disorders to be distinct impairments. Specifically, the Listings that were effective at the time of the ALJ's decision contained separate Listings for affective disorders (Listing 12.04) and anxiety-related disorders (Listing 12.06). 20 C.F.R. Part 404, Subpart P, Appendix 1. The current version of the Listings calls Listing 12.04 "depressive, bipolar and related disorders" and Listing 12.06 "anxiety and obsessive-compulsive disorders." Thus, the agency's regulations show that affective and anxiety disorders are treated as distinct impairments, which means that the ALJ's use of the term "affective disorder" at step two likely did not encompass Kounitski's alleged anxiety disorder.

In the instant case, the ALJ at step three analyzed whether Kounitski met Listing 12.04, but did not analyze Listing 12.06. *See* AR 23-24. This failure to analyze Listing 12.06 reinforces the Court's conclusion that the ALJ's use of the term "affective disorder" at step two did not encompass Kounitski's anxiety disorder. Thus, the Court must consider whether the ALJ erred by failing to find that Kounitski had the severe impairment of an anxiety disorder. Treating psychiatrist Dr. Lembke clearly diagnosed Kounitski with "anxiety disorder NOS." *See, e.g.*, AR 544, 546. Kounitski was prescribed Ativan (lorazepam), a benzodiazepine used for anxiety, and she reported to her doctors that she took Ativan about three times per week to deal with anxiety. AR 350, 411, 413, 507, 515, 546. Kounitski reported that when she went without Ativan she had difficulty making decisions. AR 543. In addition, Kounitski's husband stated that Kounitski has withdrawn from social activities due to anxiety and that Kounitski also avoids crowded places and big stores. AR 281. The ALJ gave no reason for declining to find that Kounitski had the severe impairment of anxiety even though the record evidence is sufficient to pass the de minimis step two threshold. Thus, the ALJ erred by failing to identify anxiety as one of Kounitski's severe impairments at step two. *See Webb*, 433 F.3d at 687 ("Although the medical record paints an incomplete picture of Webb's overall health during the relevant period, it includes evidence of problems sufficient to pass the de minimis threshold of step two."); *Edlund v. Massanari*, 253 F.3d 1152, 1158-59 (9th Cir. 2001) ("Given the uncontroverted diagnosis of the examining psychologist, Dr. Bremer, as to Edlund's symptoms of agitated depression and anxiety, we believe the ALJ lacked substantial evidence for dismissing Edlund's claim of a severe mental impairment at Step 2.").

### c. Obsessive-Compulsive Disorder

Finally, Kounitski argues for the first time in her motion for summary judgment that she has the severe impairment of obsessive-compulsive disorder and that the ALJ erred by not finding a severe impairment of obsessive-compulsive disorder. The medical record contains no diagnosis of obsessive-compulsive disorder. The only mention of obsessive-compulsive tendencies is in Dr.

Lembke's early treatment notes, which predate Kounitski's alleged onset date. *See, e.g.*, AR 532-34, 541, 544, 549. Moreover, these early treatment notes state that Kounitski's remote history of compulsive behaviors in childhood "did not lead to functional impairment as a child." AR 532-33. By the time of Kounitski's alleged onset date in December 2011, Dr. Lembke's notes no longer referenced obsessive-compulsive tendencies. *See, e.g.*, AR 470-71, 475-76. Nor did Kounitski allege in her application for disability insurance benefits that obsessive-compulsive disorder had any negative impact on her ability to work or otherwise function. As such, the ALJ did not err by declining to find that Kounitski had the severe impairment of obsessive-compulsive disorder.

## 2. The ALJ Improperly Discounted Kounitski's Testimony

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). At the first step, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Id.* At the second step, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* at 1014-15 (quoting *Smolen*, 80 F.3d at 1281). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Id.* at 1015 (quoting *Moore v. Comm'r of Soc. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

With regard to mental health cases in particular, the Ninth Circuit has emphasized that:

> it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. . . . [Reports of improvement] must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

*Id.* at 1017-18; *see Diedrich v. Berryhill*, 874 F.3d 634, 642 (9th Cir. 2017) (quoting *Garrison*, 759 F.3d at 1017-18). In *Garrison*, for example, the Ninth Circuit held that the ALJ erred by "improperly singl[ing] out a few periods of temporary well-being from a sustained period of impairment and rel[ying] on those instances to discredit [the claimant]." 759 F.3d at 1018. Similarly, the Ninth Circuit has found error where the ALJ's description of the claimant's daily activities was taken out of context or did not accurately reflect the record. *See, e.g.*, *Revels v. Berryhill*, 874 F.3d 648, 667-68 (9th Cir. 2017) (holding that ALJ erred by relying on reports of daily activities and mischaracterizing those reports to discredit the claimant's testimony); *Reddick v. Chater*, 157 F.3d 715, 722-23 (9th Cir. 1998) (same).

In the instant case, the ALJ found that Kounitski's "allegations of debilitating mental illness are not supported by her reported activities of daily living, psychotherapy treatment notes and medication management notes." AR 27. The ALJ highlighted evidence that Kounitski cared for her younger son, traveled, and experienced a better mood during her raw food retreat. AR 27. The ALJ noted that in May 2012, Kounitski "attempted to increase pleasant activities in her life, such as gardening and learning Spanish." AR 25. In addition, the ALJ opined that Kounitski's complaints of problems with concentration and memory were undermined by MSEs that "document that her thought process was goal directed and coherent and that her cognitive function was intact." AR 27. Finally, the ALJ noted that "in April 2011, when [Kounitski] reported symptoms as severe as those reported during the relevant period, the claimant cared for her son and managed a number of vacation rentals and investment properties that she and her husband owned." AR 27.

The Court finds that the ALJ's adverse credibility determination was based on a selective reading of the record, contrary to the Ninth Circuit's warnings that treatment notes and daily activities must be considered in light of the record as a whole. First, with regard to Kounitski's daily activities, the ALJ identified practically the only evidence in the record that supported his conclusion and often mischaracterized even that evidence. *See, e.g.*, AR 25 (characterizing

Kounitski's tendency to watch television to distract herself from suicidal ideation, AR 274, 431-32, as "watch[ing] television to distract herself" without mentioning the suicidal ideation). For example, the ALJ cited the fact that Kounitski "was able to care for her special needs son" as evidence that her impairments were not as severe as she alleged. AR 25. Kounitski and her husband both testified that interacting with her son caused Kounitski significant anxiety and depression, a conclusion consistently reinforced by Dr. Lembke's and Dr. Corcoran's treatment notes. *See* AR 47-48, 270, 275, 277, 279, 283, 411, 413, 415, 422, 425, 427, 495, 546. Moreover, the record shows that Kounitski repeatedly sought professional assistance or advice from therapists and social workers to help her manage her interactions with her son. *See, e.g.*, AR 490, 485, 499.

Kounitski and her husband both testified that Kounitski's husband is their son's primary caretaker. AR 270-71, 279. Although Kounitski told Dr. Lembke that she wakes up at 7:00 a.m. to get her son ready for school, AR 497, Kounitski's husband also stated that Kounitski is "so weak and fatigued" in the morning "that often she cannot prepare a breakfast" for their son, AR 278. Kounitski stated that she is unable to take her son to school in the morning. AR 270. In addition, Kounitski's husband stated that sometimes Kounitski is unable to leave the house to pick their son up from school due to her impairments. AR 278. Kounitski told her doctors that she hired someone to help her son with his homework after school. AR 440. The ALJ characterized that as hiring someone to help her care for her son "because she was unable to do so." AR 27. Thus, the ALJ's assertion that Kounitski was able to care for her son is not supported by the record when considered as a whole. Regardless, even if Kounitski could care for her son, caring for one's child is not necessarily inconsistent with disability, particularly where the record does not indicate what types of activities caring for the child encompassed. *See Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017).

The ALJ's assertion that Kounitski can perform light household chores, drive a car, and manage her finances similarly misstates the record. AR 25. Kounitski testified that the most she

can do in terms of household chores is light dusting. AR 272. A combination of her husband, a

paid cleaning service, and her mother do the rest of the housework and cleaning, based on

testimony from Kounitski and her husband. AR 49-50, 272, 280-81. With regard to driving,

Kounitski and her husband stated that Kounitski seldom drives because of drowsiness, and when

she does drive, it is only for short distances. AR 273, 289. Instead, Kounitski's husband and her

older son typically give her rides to her appointments. AR 273, 289. With respect to managing

finances, Kounitski's husband stated that it had become his responsibility to pay the bills because

Kounitski "often misplaces bills and can't find them later and makes mistakes." AR 281.

Further, although the ALJ viewed other activities such as attending family vacations or

attempting to return to gardening as inconsistent with Kounitski's alleged symptoms, that is not

necessarily the case. For example, Kounitski reported that some of her symptoms persisted on

vacation and the record shows that her symptoms worsened after the vacation was over. AR 411-

13, 495, 497, 499-500. Thus, the fact that Kounitski went on a family trip is not necessarily

inconsistent with her alleged symptoms and does not demonstrate that she has the capacity to

sustain a full-time job. *See Vertigan*, *v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

The record also shows that she was trying to garden again for therapeutic reasons at the

suggestion of her psychologist. AR 499-500. Moreover, the record does not indicate whether

Kounitski had any success in this attempt—the record shows only that she was trying. AR 499-

500. The fact that Kounitski tried to engage in activities for therapeutic reasons does not detract

from her credibility. *See Vertigan*, 260 F.3d at 1050. As a result, when read in light of the full

record, the ALJ's conclusion that Kounitski's daily activities contradicted her allegations of severe

depression is not supported by substantial evidence. *See Revels*, 874 F.3d at 667-68; *Vertigan*,

260 F.3d at 1050.

Finally, the fact that Kounitski managed several vacation rental and investment properties

in April 2011—before her alleged onset date—is not a clear and convincing reason supported by

substantial evidence to discount her credibility where there is no indication in the record that she

continued to dedicate a similar amount of time or maintain a similar level of responsibility with regard to the rental properties after her alleged onset date.

The ALJ committed similar errors in characterizing Kounitski's treatment records as inconsistent with her alleged symptoms of severe depression. Specifically, the ALJ highlighted parts of the record that have little to do with Kounitski's alleged symptoms or relied on isolated periods of improvement within a larger period of illness. For example, the ALJ highlighted that Dr. Lembke's and Dr. Corcoran's treatment notes showed that Kounitski was neatly groomed and cooperative and that Kounitski's thought process was goal directed and coherent and there was no evidence of a thought disorder. AR 26. But Kounitski does not allege that she suffers from a thought disorder, and so these MSE results do not undermine the credibility of her alleged depression and anxiety symptoms, nor do they undermine her allegations of concentration and memory problems. *See Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ("These observations of cognitive functioning during therapy sessions do not contradict Ghanim's reported symptoms of depression and social anxiety."). In fact, the record contains several treatment records that more directly relate to Kounitski's concentration and memory, but the ALJ did not mention these records. *See* AR 502 (May 2013 treatment notes from Dr. Levinson reporting that Kounitski had problems with MSE exercises that test short-term memory and concentration); AR 505 (same for December 2012).

The ALJ also noted that Kounitski had periods of improved mood, particularly during and after her raw food retreat. AR 26. But as the Ninth Circuit made clear in *Garrison*, it is error to "singl[e] out a few periods of temporary well-being from a sustained period of impairment and rel[y] on those instances to discredit [the claimant]." 759 F.3d at 1018. This is precisely what the ALJ did in the instant case. Kounitski's raw food retreat was in June 2012. AR 411. By mid-July 2012, however, Kounitski reported feeling "very tired" and Dr. Corcoran noted that Kounitski was "experiencing symptoms of depression which have not remitted despite medication treatment and psychotherapy." AR 412. By August 20, 2012, Dr. Lembke's treatment notes describe Kounitski

as "very dysphoric and withdrawn." AR 413. Kounitski's mood remained low through March 2013, when she was hospitalized for suicidal ideation. *See* AR 413-40. When read in the context of the record as a whole, it is clear that Kounitski's temporarily improved mood during and shortly after the raw food retreat were a "period of temporary wellbeing" amid "a sustained period of impairment." *Garrison*, 759 F.3d at 1018. The ALJ erred by relying on this limited period of improvement to discredit Kounitski's credibility.

### 3. The ALJ Erred by Failing to Address Kounitski's Husband's Testimony

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) and 20 C.F.R. § 404.1513(d)(4) & (e)). "The ALJ [i]s required to consider and comment upon" such lay witness testimony. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009); *see also Stout*, 454 F.3d at 1053 (same). Such lay witness evidence "*cannot* be disregarded without comment." *Stout*, 454 F.3d at 1053 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)). To disregard the testimony of a lay witness, "the ALJ must provide reasons 'that are germane to each witness.'" *Bruce*, 557 F.3d at 1115 (quoting *Nguyen*, 100 F.3d at 1467).

Here, Kounitski's husband filled out a function report and his comments in these reports concerned Kounitski's ability to work. *See* AR 286-93. The ALJ was thus "required to consider and comment upon" Kounitski's husband's testimony. *Bruce*, 557 F.3d at 1115. The ALJ did not mention Kounitski's husband's testimony, let alone give a reason germane to Kounitski's husband to disregard the testimony. *See* AR 20-30. The Commissioner does not dispute that the ALJ failed to address Kounitski's husband's testimony. Instead, the Commissioner argues that any error was harmless. *See* Comm'r Mot. at 8-9. Accordingly, the ALJ erred by failing to mention or give a germane reason for disregarding Kounitski's husband's testimony about her limitations. The Court addresses whether the ALJ's errors were harmless in Section III.C.5, below.

**4. The ALJ Improperly Weighed Some Medical Opinions**

Kounitski asserts that the ALJ erred by misweighing the opinions of treating psychiatrists Drs. Levinson, Morales, and Lembke, as well as the opinion of consultative examiner Dr. Gable. "Generally, the opinion of a treating physician must be given more weight than the opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician." *Ghanim*, 763 F.3d at 1160. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). To reject a treating or examining physician's contradicted opinion, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216). Even when a treating physician's opinion is contradicted, and thus not entitled to controlling weight, "in many cases" it will still "be entitled to the greatest weight and should be adopted." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)).

**a. Treating Psychiatrist Dr. Levinson**

The ALJ afforded Dr. Levinson's opinion "no weight to the extent it purports to resolve the ultimate medicolegal issue reserved to the Commissioner." AR 27. The ALJ is correct that the "final responsibility for deciding certain issues, such as whether an individual is disabled under the Act, is reserved to the Commissioner." SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006) (citing 20 C.F.R. § 404.1527), *rescinded for claims filed after March 27, 2017*, 2017 WL 3928298. However, under Ninth Circuit precedent, "an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim*, 763 F.3d at 1161. Instead, "[i]f the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide 'specific and legitimate' reasons in order to reject the treating physician's opinion." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). Here, Dr. Levinson opined that Kounitski would be unable

35

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

to work. AR 402, 510. This opinion was contradicted by the opinion of Dr. Dixit. *See* AR 408-10. Accordingly, the ALJ was required to give a specific and legitimate reason supported by substantial evidence for disregarding Dr. Levinson's opinion. *See Ghanim*, 763 F.3d at 1161; *Holohan*, 246 F.3d at 1202. Even setting aside the ultimate issue of disability, Dr. Levinson's letter and treatment notes contained other opinions, such as the opinion that Kounitski had "limited abilities to cope with adult life stressors," that the ALJ could not disregard without offering a specific and legitimate reason supported by substantial evidence.

The only reason that the ALJ gave for disregarding Dr. Levinson's opinions is that Dr. Levinson did not "attach or cite to any treatment record," and that as a result Dr. Levinson's opinion about Kounitski's ability to sustain work was unsupported. AR 28. This reason is not supported by substantial evidence. Dr. Levinson's letter appears in the record in two places. AR 402-03, 510-11. At AR 402-03, there are no accompanying records. But the letter at AR 510-11, which was marked as Exhibit 13F before the ALJ, is accompanied by eight pages of Dr. Levinson's treatment notes, which include detailed objective observations that support Dr. Levinson's opinions, *see* AR 502-09. Because the ALJ did not give a specific and legitimate reason supported by substantial evidence to ignore Dr. Levinson's opinions, the ALJ erred by giving Dr. Levinson's opinions no weight.

### b. Treating Psychiatrist Dr. Morales

As an initial matter, the ALJ appeared to doubt whether Dr. Morales was really a treating psychiatrist because "his name is not listed on the medical evidence of record." AR 28. Social Security regulations define a treating source as an "acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2). The regulations continue, "Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation

required for your medical condition(s)." *Id.* Although Kounitski listed Dr. Morales as a treating provider and Dr. Morales's letter states that he had been treating Kounitski since 2013, the ALJ is correct that the record does not contain any treatment records from Dr. Morales. While the regulations permit the Social Security Administration to seek additional evidence or request clarification from a medical provider if the evidence is incomplete, the regulations do not require the Administration to take these actions if it can make a disability determination based on the evidence it already possesses. *See* 20 C.F.R. § 404.1520b(b). In any event, it is not necessary to decide whether Dr. Morales would qualify as a treating provider under the regulations because, as explained below, the Court ultimately concludes that the ALJ did not err in discounting Dr. Morales's opinion even under the heightened standard for treating providers.

An "ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray*, 554 F.3d at 1228 (quoting *Thomas*, 278 F.3d at 957). The ALJ accorded little weight to the opinion of Dr. Morales because it contained conclusory statements and was not supported by references to objective medical evidence or treatment records. Indeed, although Kounitski listed Dr. Morales as a treating provider, the record does not contain any medical records or treatment notes from Dr. Morales. Moreover, Dr. Morales's letter briefly describes Kounitski's symptoms, but Dr. Morales does not reference any objective medical evidence in support or otherwise explain his conclusions. As such, the ALJ did not err by giving little weight to Dr. Morales's opinion.

### c. Treating Psychiatrist Dr. Lembke

The ALJ did not address the state disability certificate that treating psychiatrist Dr. Lembke completed for Kounitski in which Dr. Lembke opined that Kounitski was unable to return to work, had chronic low energy, low mood, and poor concentration, and had only a partial response to treatment. AR 259. Nor did the ALJ specify how he weighed the opinions and other medical evidence contained in Dr. Lembke's treatment notes. Under Ninth Circuit precedent, as with Dr. Levinson, the ALJ was not free to disregard without comment Dr. Lembke's opinion on

37

the issue of disability. *See Ghanim*, 763 F.3d at 1161; *Holohan*, 246 F.3d at 1202. Because the ALJ did not acknowledge Dr. Lembke's opinion on the issue of disability or explain how he weighed her other opinions, the ALJ erred.

### d. Examining Physician Dr. Gable

Finally, the ALJ accorded little weight to the opinion of examining physician Dr. Gable because Dr. Gable's opinion "appear[ed] to be based on the claimant's self-reports of severe, chronic depression" and Kounitski's "subjective complaints of poor sleep and fatigue." AR 28. Specifically, Kounitski argues that the ALJ erred by discounting Dr. Gable's opinion that Kounitski's fatigue would prevent her from being able to stand for six hours per day. Kounitski Mot. at 15. If a medical opinion is based "to a large extent on a claimant's self-reports that have been properly discounted as incredible," that can be a specific and legitimate reason to discount an examining provider's opinion. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Here, however, as the Court has already explained, the ALJ did not properly discount Kounitski's subjective symptom testimony. Moreover, Kounitski's "subjective complaints of poor sleep" were not merely subjective. Rather, Kounitski's record contains sleep studies and a diagnosis of obstructive sleep apnea. AR 391-98. As a result, the ALJ's conclusion that Dr. Gable relied on Kounitski's subjective complaints was not a specific and legitimate reason supported by substantial evidence.

However, "[a]n ALJ may reject an examining physician's opinion if it is contradicted by clinical evidence." *Ryan*, 528 F.3d at 1199. In the instant case, the ALJ also noted that after Dr. Gable's evaluation, Kounitski responded well to Nuvigil, which helped increase her energy levels. AR 28; *see also* AR 428-38 (Dr. Lembke's treatment notes showing positive response to Nuvigil). Because Dr. Lembke's treatment notes suggest that Nuvigil alleviated at least some of Kounitski's daytime fatigue, the ALJ did not err in discounting Dr. Gable's opinion about Kounitski's fatigue and ability to stand for six hours per day.

### 5. The Errors Were Not Harmless

Even when an ALJ errs, reversal is not warranted if the error is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). An error is harmless "where it is inconsequential to the ultimate nondisability determination." *Id.* (internal quotation marks omitted). Accordingly, "in each case [the Court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Id.* It is clear that the ALJ's errors in this case were not harmless.

If the ALJ had found that Kounitski had the severe impairments of fibromyalgia or anxiety disorder at step two, or if the ALJ had credited Kounitski's testimony, Kounitski's husband's testimony, or the opinions of Dr. Levinson or Dr. Lembke, the ALJ's RFC would likely have been different. Specifically, given the content of the improperly discredited evidence, crediting some or all of this evidence may have resulted in an RFC with some additional limitations in attendance or concentration, persistence, or pace. Testimony from the second VE shows that more than one absence per month or more than twenty percent of each workday off-task would preclude all employment. AR 85-86. Accordingly, the Court cannot conclude that the ALJ's errors were "inconsequential to the nondisability determination." *Molina*, 674 F.3d at 1115; *see also Stout*, 454 F.3d at 1055-56.

### 6. Remand for Further Proceedings is Appropriate

Kounitski urges the Court to remand to the Commissioner for an award of benefits. Kounitski Mot. at 19-20. "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 847 F.3d 1130, 1133 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). However, the Ninth Circuit has developed a three-step analysis, sometimes called the "credit-as-true rule," for determining when a remand for an award of benefits is appropriate. *See id.* First, the Court asks whether the "ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion." *Treichler*, 775 F.3d at 1100-01 (quoting *Garrison*, 759 F.3d at 1020). Second, the Court determines "whether the record has been fully developed, whether there are outstanding

issues that must be resolved before a determination of disability can be made, and whether further administrative proceedings would be useful." *Id.* at 1101 (internal quotation marks and citations omitted). "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate." *Id.* Third, if the Court concludes that no outstanding issues remain and further proceedings would not be useful, the Court may exercise its discretion to credit the relevant testimony as true and remand for an award of benefits. *Id.*

Here, the first step of the credit-as-true rule is satisfied because the ALJ failed to provide legally sufficient reasons for rejecting claimant, lay witness, and medical opinion evidence. *See Treichler*, 775 F.3d at 1100-01. However, the second step is not satisfied. Several outstanding issues must be resolved before a disability determination can be made, including whether Kounitski's fibromyalgia diagnosis meets the Social Security Administration's requirements, whether Kounitski meets Listing 12.06 for anxiety disorders, and whether the ALJ's RFC must change in light of the errors identified in this Order. Further proceedings, particularly proceedings that include the testimony of an impartial medical expert, would likely be useful in resolving these issues. Indeed, Ninth Circuit precedent requires that a medical expert be called when the medical evidence is ambiguous as to the claimant's onset date. *See Diedrich*, 874 F.3d at 638-39. The procedural history of this case suggests that if the ALJ finds Kounitski disabled on remand, the onset date of any disability may be at issue. As such, the second step of the credit-as-true rule is not satisfied, and so remand for further proceedings on an open record is appropriate. *See Leon*, 874 F.3d at 1135-36 (remanding for further proceedings on an open record); *Brown-Hunter v. Colvin*, 806 F.3d 487, 496 (9th Cir. 2015) (same).

## IV.  CONCLUSION

For the foregoing reasons, Kounitski's motion for summary judgment is GRANTED IN PART and the Commissioner's motion for summary judgment is DENIED. The case is remanded to the Social Security Administration for further proceedings on an open record.

40

**IT IS SO ORDERED.**

Dated: November 28, 2017

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No. 16-CV-03018-LHK
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT